MICHEL, Chief Judge,
dissenting.
I respectfully dissent from the majority’s vacatur and remand-in-part of the district court’s decision on the bases of the trial court’s incorrectly construing the claim term “aesthetic correction circuitry” under section 112 and erring in the exclusion of Windows as an infringing product, first suggested two years after the complaint was filed. I believe that in view of its specific language, “aesthetic correction circuitry” was correctly construed as a means-plus-function claim limitation. Nor do the cases relied on by the majority support, much less require, a different disposition. Moreover, I believe that excluding Windows as an infringing product was not an abuse of the trial court’s discretion because MIT itself urged, successfully, that discovery be delayed.
I.
The district court correctly interpreted “aesthetic correction circuitry” as a means-plus-function claim despite the absence of the term “means for” in view of the presence of functional language because the limitation fails to recite sufficiently definite structure, as our precedent requires. Thus, the presumption against application of section 112, paragraph 6 was overcome. Indeed, on this record, I find it overcome as a matter of law.
The parties agree that “the term ‘circuitry],’ by itself connotes some structure” to one skilled in the art. Apex, Inc. v. *1361 Raritan Computer, Inc., 325 F.3d 1364, 1373 (Fed.Cir.2003) (emphasis added). The issue, however, is whether the “aesthetic correction circuitry” limitation “recite[s] sufficiently definite structure,” id. at 1372 (emphasis added); accord Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1319 (Fed.Cir.2004), which is required to avoid section 112, paragraph 6 in a claim using functional language, even in the absence of “means for.”
This “definite structure” requirement is well-established in our precedent. “To invoke this statute [section 112, paragraph 6], the alleged means-plus-function claim element must not recite a definite structure which performs the described function.” Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed.Cir.1996); see also B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed.Cir.1997) (“Because this limitation ... does ' not recite definite structure in support of its function, it is subject to the requirements of 35 U.S.C. § 112, ¶ 6 .... ”); Personalized Media Commc'ns, LLC v. Int’l Trade Comm’n, 161 F.3d 696, 704 (Fed.Cir.1998) (“In deciding whether either presumption [‘means for’ with stated function presumes that section 112, paragraph 6 applies, while no ‘means for’ with stated function presumes that section 112, paragraph 6 does not apply] has been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, ¶ 6.”); Watts v. XL Sys., Inc., 232 F.3d 877, 880 (Fed.Cir.2000) (“[T]he focus remains on whether the claim ... recites sufficiently definite structure.”); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed.Cir.2002) (“Life Fitness can rebut this presumption if it demonstrates that the claim term fails to ‘recite sufficiently definite structure.’ ”); Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed.Cir.2004) (“The presumption that a limitation lacking the term ‘means’ is not subject to section 112 ¶ 6 can be overcome if it is demonstrated that the ‘claim term fails to recite sufficiently definite structure.’ ”) (internal quotations omitted). Indeed, section 112, paragraph 6 is rooted in the definiteness requirement of section 112, paragraph 2: “Congress has provided this statute [section 112, paragraph 6] as a specific instruction on interpretation of the type of claim which otherwise might be held to be indefinite.” Data Line Corp. v. Micro Techs., Inc., 813 F.2d 1196, 1201 (Fed.Cir.1987); accord Jonsson v. Stanley Works, 903 F.2d 812, 819 (Fed.Cir.1990); ’ see also Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1536 (Fed.Cir.1991) (“Absent section 112(6), claim language which requires only a means for performing a function might be indefinite.”). Such a claim would, of course, be invalid under section 112, paragraph 2. Although both Apex and Linear, relied on dispositively and exclusively by the majority, found sufficiently definite structure in the claim language, both are distinguishable from the instant case, in which the claim language is dramatically different.
In Apex, a number of claim limitations using the term “circuit” were at issue. One such representative claim with the representative limitations was:
a first interface circuit for receiving keyboard and cursor control device signals from the workstation;
an on-screen programming circuit that produces video signals for display on the video monitor;
a programmed logic circuit coupled to the first interface that transmits the keyboard and cursor control device signals to the programmable switch and controls the on-screen programming circuit to produce the video signals upon *1362 the detection of a predefined input from a user of the workstation, the programmed logic circuit further operating to detect keyboard or cursor control device signals received while the on-screen programming circuit is producing video signals on the video monitor and to control the programmable switch in response to the keyboard or cursor control device signals detected; and a second interface circuit disposed between the programmable switch and the selected computer for supplying the keyboard and cursor control device signals routed through the programmable switch to the selected computer.
325 F.3d at 1368; United States Patent No. 5,884,096, col. 13, 1. 53 — col. 14, 1. 24. In holding that the term “interface circuit” was not a means-plus-function limitation, we explained that “the term ‘circuit’ with an appropriate identifier such as ‘interface,’ ‘programming’ and ‘logic,’ certainly identifies some structural meaning to one of ordinary skill in the art.” Apex, 325 F.3d at 1373 (emphases added). Moreover, we elaborated that “interface circuit” connotes sufficiently definite structure because “interface” and “interface circuit” are defined in electronics and computing dictionaries so as to “connoted specific structures to one of ordinary skill in the art.” Id. at 1374. We then remanded the case to the district court for further development of the record and a similar analysis for the remaining “circuit” terms. Thus, not every “adjectival qualification” (“A.Q.”), id., connotes sufficiently definite structure for the term “circuit,” but rather an “appropñate ” A.Q., as demonstrated in Apex by technical dictionaries.
By contrast, the “circuitry” claim limitation in this case recites only the following and nothing more:
aesthetic correction circuitry for interactively introducing aesthetically desired alterations into said appearance signals to produce modified appearance signals;
’919 patent, col. 15, 11. 38-41. Unlike in Apex, here we have no evidence whatsoever that “aesthetic correction” is such an “appropriate” A.Q. that it would connote sufficiently definite structure to one skilled in the art. Indeed, “aesthetic correction” itself may be solely functional language. For example, we were shown no evidence that any technical dictionaries suggest to the artisan a sufficiently definite structure for “aesthetic correction circuitry” or even list such a term. Nor did experts from either side opine that one skilled in the art would understand “aesthetic correction circuitry” to connote sufficiently definite circuit structure. While Microsoft’s expert Anthony Johnson stated that one skilled in the art would have understood “aesthetic correction circuitry” to mean “hardware that allows an operator to interactively introduce changes into the appearance signals to create modified appearance signals,” this does not connote definite structure, but merely some unspecified hardware structure. The record on appeal does not reflect the opinion of MIT’s expert, Bradley Paxton, regarding the meaning of “aesthetic correction circuitry.” Rather, in the paltry portion of his testimony in the appellate record, he merely discusses “circuitry” and the fact that “[c]ircuitry contains a lot of components, including wires.” This fails to impart definite structure to “aesthetic correction circuitry” because the components and their arrangements are unstated. The inventor, William Schreiber, explained that “aesthetic correction circuitry” means to one skilled in the art “hardware or software used by the system operator to introduce desired alterations into the appearance signals of an image.” Again, this does not elucidate a definite structure, but merely suggests some generic structure, namely, some unspecified arrangement of *1363 unidentified hardware components or software. Neither of MIT’s experts even attempted to opine that “aesthetic correction” connotes definite structure such that “aesthetic correction circuitry” would suggest a sufficiently definite array of components to one skilled in the art. Thus, I cannot discern sufficiently definite structure from the term “aesthetic correction circuitry” to avoid means-plus-function treatment.
Similarly, in Linear, a representative claim with limitations concerning “circuit” recited:
A circuit for controlling a switching voltage regulator, the regulator having (1) a switch circuit coupled to receive an input voltage and including a pair of synchronously switched switching transistors and (2) an output circuit including an output terminal and an output capacitor coupled thereto for supplying current at a regulated voltage to a load, the control circuit comprising:
a first circuit for monitoring a signal from the output terminal to generate a first feedback signal; a second circuit for generating a first control signal during a first state of circuit operation, the first control signal being responsive to the first feedback signal to vary the duty cycle of the switching transistors to maintain the output terminal at the regulated voltage; and
a third circuit for generating a second control signal during a second state of circuit operation to cause both switching transistors to be simultaneously OFF for a period of time if a sensed condition of the regulator indicates that the current supplied to the load falls below a threshold fraction of maximum rated output current for the regulator, whereby operating efficiency of the regulator at low output current levels is improved.
379 F.3d at 1316. In ascertaining that these “circuit” limitations were not means-plus-function limitations, Linear began with the approach of Apex and CCS Fitness: “To help determine whether a claim term recites sufficient structure, we examine whether it has an understood meaning in the art.” Id. at 1320. Linear then quoted two dictionary definitions of “circuit,” one identical to the dictionary definition in Apex. Yet, while Apex merely concluded from these dictionary definitions that “circuit” connoted “some structural meaning to one of ordinary skill in the art,” Apex, 325 F.3d at 1373 (emphases added), Linear relied on these dictionary definitions, Apex, and certain non-functional, operational claim language to state: “Thus, when the structure-connoting term ‘circuit’ is coupled with a description of the circuit’s operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply.” Linear, 379 F.3d at 1320 (citing Apex, 325 F.3d at 1373) (emphases added). In its holding, however, Linear also required expert testimony as to whether these descriptions of the circuit’s operation conveyed sufficient structure to an artisan: “We hold that because the term ‘circuit’ is used in each of the disputed limitations ... with a recitation of the respective circuit’s operation in sufficient detail to suggest structure to persons of ordinary skill in the art, the ‘circuit’ and ‘circuitry’ limitations of such claims are not means-plus-function limitations ....” Id. at 1320-21 (emphasis added). Thus, not any operational language suffices.
Linear therefore extended the reasoning of Apex such that the use of “circuit” coupled with a description of the circuit’s operation may connote “sufficient structural meaning,” id. at 1320, to one skilled in the art. In Linear, this description of the *1364 first circuit’s operation was “for monitoring a signal from the output terminal to generate a first feedback signal.” Id. The description of the second circuit’s operation was “for generating a first control signal during a first state of circuit operation.” Id. at 1316. Similarly, the description of the third circuit’s operation was “for generating a second control signal during a second state of circuit operation to cause both switching transistors to be simultaneously OFF.” Id. Importantly, however, Linear relied on expert testimony to determine whether these descriptions of the circuit’s operation conveyed sufficient structure to one skilled in the art. “That persons of ordinary skill in the art would understand the structural arrangements of circuit components from the term ‘circuit’ coupled with the qualifying language of claim 1 was recognized by Linear’s expert witness,” id. at 1320 (emphasis added), who opined that one skilled in the art “would have an understanding of, and would be able to draw, structural arrangements of the circuit elements defined by the claims.” Id. (emphases added). Thus, in Linear, it was not merely the particular descriptions of the operation of the circuit that connoted sufficient structure, but also the expert testimony that these descriptions conveyed sufficient structure to one skilled in the art because the artisan “would be able to draw[ ] structural arrangements' of the circuit elements.” Id.
Here, we face a description of only the circuit’s function, not of how it operates with other circuits or devices to carry out that function. Moreover, even assuming we had a description of the circuit’s operation, “for interactively introducing aesthetically desired alterations into said appearance signals to produce modified appearance signals,” ’919 patent, col. 15, 11. 38-41, we were shown no evidence from which to conclude that this description identifies the circuit components or conveys the arrangement of circuit components to one skilled in the art so that he could draw the circuit’s elements and their sequence.
In sum, both Apex and Linear relied on additional information in the claim to determine whether the limitation as a whole conveyed sufficiently definite circuit structure, i.e., elements or components and their sequence, to an artisan. Apex relied on dictionary definitions of an accompanying “appropriate” A.Q. that suggested sufficiently definite structure to one skilled in the art. Linear relied on expert testimony that the claim’s description of the operation of the circuit connoted definite structure. Here, we have neither a dictionary definition to establish that “aesthetic correction” is an appropriate A.Q. to suggest definite structure nor expert testimony that the accompanying description of the operation of the circuit, if any, connotes definite circuit structure-sequence of particular circuit eomponents-to an artisan so that he could draw on paper the arrangement of the components needed.
II.
The district court denied MIT’s belated attempt to add Windows as an infringing device. At the outset of the case, the court provided a proposed Docket Control Order on June 19, 2002. This proposed order stated that Preliminary Infringement Contentions were due prior to the Marlcman hearing. It did not allow for amended or supplemental infringement contentions. It also contained a “No Excuses” provision, which stated: “A party is not excused from the requirements of the Proposed Docket Control Order because it has not fully completed its investigation of the case ... or because another party has not made its disclosures.” MIT did not *1365 object to the “No Excuses” clause. Yet in response to the proposed order, MIT did request that no discovery occur until after the Markman hearing.[1] The court amended the proposed Docket Control Order to include MIT’s requested stay of discovery until after the Markman hearing. After the Markman hearing and discovery, MIT attempted to “update” its infringement contentions. Microsoft then moved to exclude Windows as an additional accused device and strike MIT’s updated infringement contentions. The court granted the motion because, it said, to do otherwise would have caused “significant delay that could have been avoided,” Mass. Inst. of Tech. v. Abacus Software, No. 01-344, at 10 (E.D.Tex. Sept. 10, 2004) (order granting motion to exclude), especially given that “Microsoft did not have the opportunity to consider Windows in drafting its claim construction arguments.” Id. I agree.
First, had MIT not requested stay of discovery until after the Markman hearing, it would have discovered Windows as an allegedly infringing device prior to the Markman hearing. Second, MIT requested the stay of discovery even though it already knew, based on the trial court’s June 19, 2002 proposed scheduling order, that incomplete investigation of its case— i.e., uncompleted discovery — was not an excuse for deviation from the scheduling order, including the deadline for infringement contentions. Third, it is difficult to fathom how the district court’s construction of “aesthetic correction circuitry” as a means-plus-function limitation, which narrowed the claim term, should have expanded the set of potentially infringing devices such that MIT would only have been able to identify Windows as an allegedly infringing device after the limitation had been so narrowed. Indeed, MIT utterly fails to explain how construction of this limitation as a means-plus-function limitation could have first apprised MIT that Windows might infringe. Moreover, it is difficult to understand why MIT could not have contended prior to the Markman hearing that Windows — software—allegedly infringed, given that in its Markman brief MIT argued that “aesthetic correction circuitry” includes “hardware or software” — not only hardware, as Microsoft argued. Fourth, to add this new accused product two years into litigation would have caused undue delay and prejudice to Microsoft — and all other parties in this complex litigation against 214 defendants — because claim construction had occurred, invalidity contentions had been served, depositions had been taken, expert reports had been served, etc.[2] Fifth, adding an entirely new accused product was not an “update”' — it materially changed the theories of the case.
Moreover, I disagree that MIT did not have actual notice that it would not be able to “update” its infringement contentions based on incomplete discovery. The majority states that “MIT was not provided with sufficient notice that its preliminary infringement contentions would be deemed final” because MIT was not notified that *1366 Judge Craven would “rel[y]” on Judge Ward’s Rules. This is misleading on three points: (1) notice, (2) finality, and (3) Judge Ward’s Rules.
First, MIT was provided with notice that it would not be allowed to “update” its infringement contentions based on incomplete discovery through the “No Excuses” clause. The no excuses clause explicitly notified MIT that it would not be excused from the requirements of the scheduling order “because it ha[d] not fully completed its investigation of the case.” Incomplete discovery, I infer, is the real reason that MIT wanted to update its infringement contentions. Incomplete discovery is one reason explicitly noticed by the no excuses clause that MIT was not allowed to do so.
Indeed, the August 23, 2002 scheduling order required that preliminary infringement contentions be filed by September 3, 2002. This same order set a deadline for opening Markman briefs of February 3, 2003. This five-month delay between filing of preliminary infringement contentions and of the opening Markman briefs strongly suggests that the purpose of this extended time frame was to allow the parties to develop their respective theories of the case, litigation strategies, and claim constructions with the allegedly infringing products in mind. Allowing MIT thereafter to “update” its contentions in contravention of this notice would have allowed it to subvert the very purpose of these provisions of the scheduling order. Moreover, the March 10, 2003 Early Mediation Deadline set in the same scheduling order further implies that the purpose of the infringement contention deadline combined with the no excuses clause was to narrow the issues in the case, including the issue of infringement, to facilitate early settlement, especially in this large, complex case.
Second, the district court did not need to notify MIT that its preliminary infringement contentions would be deemed “final,” as the majority states, because the district court never deemed them “final.” Nowhere in her order did Judge Craven characterize MIT’s infringement contentions as “final.” Rather, the district court, applying its no excuses clause, refused to allow MIT to add an allegedly infringing product based on incomplete discovery. Indeed, the no excuses clause seems to contemplate — and obviate — such a situation as we have here: a belated attempt to add an infringing product based on incomplete discovery.[3] The no excuses clause quashed such a possibility in no uncertain terms. Thus, while other reasons may have allowed plaintiffs upon a showing of good cause to introduce additional infringement contentions beyond the preliminary contentions, incomplete discovery was explicitly not such a reason.
Third, I further disagree with the majority’s and MIT’s characterization of Magistrate Judge Craven’s use of Judge Ward’s Local Patent Rules in granting Microsoft’s motion to exclude Windows as an infringing product. The majority states that Judge Craven was “govern[ed]” by Judge Ward’s Rules and “relied” on those Rules. This is inaccurate.
The court issued its claim construction order on July 3, 2003. MIT served its Updated Disclosure of Asserted Claims *1367 and Preliminary Infringement Contentions re Defendant Microsoft Corporation on Microsoft on December 22, 2003, attempting to add Windows as an infringing product for the first time since filing its complaint on December 28, 2001. Yet in her November 4, 2008 Order granting the motion for entry of a revised Docket Control Order, Judge Craven stated that she was using Judge Ward’s Local Patent Rules as “guidance.” In her September 10, 2004 Order granting Microsoft’s motion to exclude Windows as an infringing product, Judge Craven again cited Judge Ward’s rules. Yet it does not appear that she viewed these rules as binding on her or on the parties. Rather, it appears that she used them to justify and explain in part the grant of Microsoft’s motion, in the same way that she cited case law to justify and explain her decision (as all courts do). I see no error, constitutional or other, in this use of Judge Ward’s rules, unlike the majority, nor a violation of Federal Rule of Civil Procedure 83(b). From the no excuses clause, MIT had actual notice that the infringement contentions were not subject to expansion from discovery results occurring after the Mark-man hearing. Indeed, because the no excuses clause provided sufficient notice that MIT would not be allowed to add an infringing product based on incomplete discovery, whether Judge Craven gave sufficient notice of her alleged reliance on Judge Ward’s rules is irrelevant.
I certainly see no abuse of discretion in excluding Windows. MIT concedes that “this Court should apply the abuse of discretion standard on appeal” regarding the exclusion of Windows as an infringing product. The majority equivocates on the standard it uses to determine that this exclusion was reversible. The majority states that “district courts are afforded broad discretion in interpreting their own orders.” Maj. Op. at 1358. In a footnote, it then cites a case that holds that abuse of discretion is the standard of review. Upon reaching its conclusion, however, the majority simply states that the “district court erred.” That appears to be de novo review, rather than review for abuse of discretion. Indeed, a judge’s discretion is at its broadest on matters of trial management.
“[Rjulings which rested largely in the sound discretion of the court ... may be made the basis for reversal only where it is made to appear not merely that the ruling might have been the other way but that, as made, there was a grave and serious abuse of discretion .... ” Fulenwider v. Wheeler, 262 F.2d 97, 99 (5th Cir.1959). In particular, “[t]he Civil Rules endow the trial judge with formidable case-management authority.” Rushing v. Kan. City S. Ry. Co., 185 F.3d 496 (5th Cir.1999) (quoting Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315 (1st Cir.1998)); see also Macklin v. City of Netv Orleans, 293 F.3d 237, 241 (5th Cir.2002). Here, neither the majority nor MIT has demonstrated “grave and serious” error. The majority simply opines that Judge Craven failed to provide “clear notice” that the initial infringement contentions would be deemed final even though ample evidence contradicts this, as discussed above. Moreover, it seems that Judge Craven was not “govern[ed]” by Judge Ward’s Rules, as the majority contends. Thus, while another reasonable judge may have ruled another way, this ruling falls far short of meeting the rigorous standard of abuse of discretion.

. In Plaintiffs' Proposed Scheduling Conference Agenda, MIT stated: "Plaintiffs, however, believe that the parties can avoid duplica-tive and wasteful discovery requests by the Court imposing the following limitations: No individualized discovery may be served until after the Court issues its Markman ruling.” MIT does not deny that MIT requested this stay of discovery. Thus, MIT’s arguments in its appeal briefs that "[t]he district court did not permit the needed discoveiy until after the Markman ruling” are disingenuous.

. For example, Bradley Paxton, MIT's expert, was deposed February 7, 2003. Microsoft’s expert report by Anthony Johnson was submitted in support of its Markman brief on February 18, 2003.

. MIT repeatedly stated in its appellate briefs that incomplete discovery was the reason for its delay in "updating” its infringement contentions, viz., "the district court arbitrarily forced Appellants into final infringement contentions without complete infringement discovery,” "Appellants could not finalize their infringement contentions until after they obtained discovery into the accused product’s source code as well as manufacturing methods.”