**LIFETIME PRODUCTS, INC., Plaintiff,**

v.

**GSC TECHNOLOGY CORP. and GSC Forwarding Company, Inc., Defendants.**

**No. 03–C–3943.**

United States District Court, N.D. Illinois, Eastern Division.

May 24, 2004.

David R. Wright, Larry R Laycock, L Rex Sears, Tige Keller, Janna L Jensen, Clinton E Duke, L David Griffin, Workman, Nydegger & Jensen, Salt Lake City, UT, David M. Frischkorn, Stephen Richard Carden, Nicole Anne Fiorella, McDonnell, Boehnen, Hulbert & Berghoff, Ltd., Chicago, IL, Eileen E Buholtz, Connors, Corcoran, Hall and Meyering, Rochester, NY, for Lifetime Products, Inc., a Utah Corporation, plaintiff.

Granger Cook, Jr., Edward David Manzo, Cook Alex McFarron Manzo, Cummings Mehler Ltd, Lynn Hagman Murray, Gary M. Miller, Grippo & Elden, Mark J. Murphy, Cook Akex McFarron Manzo, Cummings Mehler Ltd, Chicago, IL, James S. Pristelski, Motorola, Inc., Schaumburg, Jeana Rose Lervick, Cook, Alex, McFarron, Manzo, Cummings & Mehler, Ltd., Chicago, IL, for GSC Technology Corp., a Canadian corporation, GSC Forwarding Company, Inc., a New York corporation, defendants.

## CLAIM CONSTRUCTION

CASTILLO, District Judge.

Lifetime Products, Inc. ("Lifetime") is a manufacturer of, among other things, polyethylene folding tables. Lifetime brought this patent infringement action against GSC Technology Corp. and GSC Forwarding Company, Inc. (collectively "GSC") alleging that GSC sells tables that infringe on four of Lifetime's patents: U.S. Patent Numbers 6,431,092 (the "'092 patent"), 6,530,331 (the "'331 patent"), 6,550,404 (the "'404 patent") and 5,536,552 (the "'552 patent"). The allegedly infringing tables are: (1) the Enduro four foot table; (2) the Enduro Rochester table; (3) the 2003 Enduro six foot table; (4) the Enduro eight foot table; (5) the Enduro II four foot table; (6) the Enduro II six foot table;[1] and (7) the Enduro II five foot round table. The parties dispute the meaning of numerous terms in the patents-in-suit, so we must construe all disputed terms to permit an infringement determination.

---

1. GSC did not provide Lifetime with a physical sample of this table, but instead represented that it was identical to the Enduro II four foot table "in all relevant respects." (*See* R. 69, Lifetime's Second Supplement at 1.) GSC, however, asserted in its non-infringement charts that the Enduro II six foot table is different from the Enduro II four foot table because its legs are not "laterally offset." (*See* R. 72, GSC's Non–Infringement Charts, Ex. 5 at 2.) Accordingly, we deem this difference irrelevant and consider the Enduro II six foot table to be identical to the Enduro II four foot table.

## LEGAL STANDARDS

Claim construction is the exclusive duty of the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). To construe a claim, a court first looks to the intrinsic evidence of record, which is the patent's claims, specification or written description, and prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). After considering all of the intrinsic evidence, a court may consider relevant extrinsic evidence if necessary to construe a claim. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.,* 292 F.3d 1363, 1374 (Fed.Cir. 2002).

"[T]he analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Brookhill–Wilk 1, L.L.C. v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1298 (Fed.Cir.2003) (internal quotations omitted).

> Generally, terms in a patent claim are given their plain, ordinary, and accustomed meaning to one of ordinary skill in the relevant art. After identifying the plain meaning of a disputed claim term, the court examines the written description and the drawings to determine whether use of that term is consistent with the ordinary meaning of the term.

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.,* 318 F.3d 1143, 1148 (Fed.Cir.2003) (internal citation omitted). There is a "strong presumption" that a claim term should be accorded its ordinary meaning. *Apex v. Raritan Computer, Inc.,* 325 F.3d 1364, 1371 (Fed.Cir.2003). "Dictionaries are always available to the court to aid in the task of determining meanings that would have been attributed by those of skill in the relevant art to any disputed terms used by the inventor in the claims." *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002). The presumption that a term should be accorded its ordinary meaning is only overcome if: (1) the patentee acted as his own lexicographer and defined a term differently or (2) the ordinary meaning of the term would render a claim meaningless or unamenable to construction. *Prima Tek II,* 318 F.3d at 1148.

A court should also consider a patent's specification or written description. The specification should be used to construe claim terms, but the specification cannot limit the scope of a patent's claims. *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 904 (Fed.Cir.2004). Similarly, the specification cannot expand or broaden the scope of a patent's claims. *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,* 355 F.3d 1353, 1359 (Fed.Cir.2004); *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1562 (Fed.Cir.1991) (stating that permitting the specification to expand the scope of a patent's claims "would encourage an applicant to escape examination of a more broadly-claimed invention by filing narrow claims and then, after grant, asserting a broader scope of the claims based on a statement in the specification of an alternative never presented in the claims for examination"). A court should also consider the prosecution history if it is in evidence. *Vitronics,* 90 F.3d at 1582.

The prosecution history can be used to construe claim terms, but it can limit the scope of a patent's claims if the patentee expressly disclaimed a particular claim construction. *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995).

Finally, a court is not required to hold an evidentiary *"Markman"* hearing when undertaking claim construction.

*Ballard Med. Prods. v. Allegiance Health-care Corp.*, 268 F.3d 1352, 1358 (Fed.Cir. 2001).

## CLAIM CONSTRUCTION [2]

### I. Disputed Terms in the '092 Patent

We must construe the following disputed terms in the '092 patent: (1) frame, (2) mounting surface, (3) retaining assembly, (4) mounting member, (5) securing member, (6) foot portion, and (7) first end and second end.

### A. Frame

■ '092 patent claim 76 states that the table comprises "a frame connected to the mounting surface of the table top." (R. 58, Keller Decl., Ex. A, '092 Patent, Claim 76.) GSC asserts that none of its tables have frames because they only have side rails. Lifetime claims that the term "frame" is broad enough to include a structure that is composed only of side rails. To construe this term, we must first consider the patent's claims. Claim 76 states that a frame includes "a pair of generally parallel disposed side rails," but the claims do not explicitly state whether a frame can consist only of side rails. Accordingly, we must consider the patent's specification.

The specification defines frame broadly. First, it states that the frame may comprise side rails, may comprise end rails, and that "the end rails and the side rails need not interrelate at all, but could simply be attached to the respective interior opposing side walls of the mounting surface of the table top." [3] (*Id.* at 5:42, 6:22, 6:67.) The specification also states that "the frame may be configured in a variety of shapes and configurations, including, but not limited to, a circle, polygon, square, rectangle, triangle, or any other suitable geometric configuration." (*Id.* at 7:13.) In these ways, the specification indicates that the term "frame" should be broadly construed to include structures that consist only of side rails.

This construction is also supported by the ordinary meaning of the term "frame." *See Texas Digital Sys.*, 308 F.3d at 1202. The dictionary lists two possible definitions: (1) "something composed of parts fitted together and united" and (2) "the

2. The parties noted many disputes concerning general terms used in the patents-in-suit. The briefing does not permit this Court to determine whether the parties seek construction of these terms or are merely asserting a factual dispute relevant to infringement. Out of an abundance of caution and to ensure that this action is resolved expediently, we accord all of these general disputed terms their ordinary meaning, *see* note 4, *infra*: (1) "adjacent" means "not distant," *see Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1373 (Fed.Cir. 2004); (2) "boundary" means "something (as a line, point, or plane) that indicates or fixes a limit or extent;" (3) "connect" means "to become joined;" (4) "coplanar" means "lying or acting in the same plane;" (5) "free-standing," like "freestanding," means "standing alone or on its own foundation free of support or attachment;" (6) "generally" envisions some amount of deviation, *see Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed.Cir.2003), (for example, generally parallel would envision some amount of deviation from exactly parallel); (7) "independent" means "not dependent" or not "relying on another for support;" (8) "parallel" means "everywhere equal distant," *see id.* (defining parallel); (9) "pivotally"—used in the phrases "pivotally connected" and "pivotally attached"—means "in a manner that permits turning;" (10) "plane" means "a flat or level surface;" and (11) "side" means "one of the longer bounding surfaces or lines of an object especially contrasted with the ends." We did not construe the term "laterally offset," because as explained in note 1, *supra*, we have deemed this difference irrelevant. The construction of these terms applies, when applicable, to all four patents-in-suit.

3. Throughout this claim construction, all bolded numbers in the specification, which refer to the specification's figures, have been omitted.

constructional system that gives shape and strength."[4] The first definition would require that the frame components be "fitted together and united," so this definition would exclude frames consisting of side rails because side rails are neither fitted together nor united. The second definition is much broader and would include many different types of frames. The second definition is consistent with the patent's claims and specification, which indicate that a frame can consist solely of side rails. We therefore construe the term "frame" broadly to include structures consisting only of side rails.

## B. Mounting Surface

■ '092 patent claim 76 states that the table comprises "a frame connected to the mounting surface of the table top." (R. 58, Keller Decl., Ex. A, '092 Patent, Claim 76.) GSC contends that, even if the side rails on its tables constitute a frame, the side rails are connected to interior walls, rather than to a mounting surface. GSC asserts that the mounting surface should be construed as the "flat underside of the table top." For the reasons provided below, we adopt GSC's proposed construction.

The patent's claims do not explicitly define the term "mounting surface." Claim 1 simply states that the table comprises "a working surface and a mounting surface." (Id., Claim 1.) This claim does not provide any other details about the mounting surface. The patent's specification supports a broad interpretation of mounting surface because it states that the interior walls are part of the mounting surface. (Id. at 5:51–54.) This broad definition, however, is inconsistent with other claims. For example, claim 17 refers to a "boundary defined by the mounting surface and the down-

wardly extending lip." (Id., Claim 17.) The downwardly extending lip is, therefore, not part of the mounting surface. And claim 15 states that the support pedestals "are disposed generally parallel and adjacent to the mounting surface of the table top in the collapsed position." (Id., Claim 15.) The mounting surface must be generally flat to permit the support pedestals to be generally parallel to it in the collapsed position. Were the mounting surface to encompass the entire underside of the table top, there would be no boundary between the downwardly extending lip and the mounting surface and it would be impossible for anything to be generally parallel with the mounting surface. The claims, therefore, limit the scope of the mounting surface to the "flat underside of the table top." Notwithstanding the broad meaning of mounting surface used in the specification, we construe the term "mounting surface" as the "flat underside of the table top."

## C. Retaining Assembly

■ '092 patent claim 76 states that the table comprises a "retaining assembly including a cross brace member." (Id., Claim 76.) GSC claims that its seven tables do not have a retaining assembly for two reasons. First, GSC claims that a retaining assembly must consist of more than one part. Second, GSC claims that a retaining assembly only applies to structures that "interrelat[e] the ends of the two support braces to one another thereby to nullify a force applied to one of them." We agree that a retaining assembly must consist of more than one part, but disagree that a retaining assembly is limited to the function described by GSC.

4. Throughout this claim construction, the ordinary meaning of all terms were obtained from the Merriam–Webster Online Dictionary. This dictionary is located at <www.m-w.com > and was last accessed by this Court on May 18, 2004.

Similar to the term "frame," which we have already construed, the patent's claims do not explicitly define the term "retaining assembly," but claim 76 states that a retaining assembly includes "a cross brace member." (*Id.*) Once again, the specification broadly defines the disputed term. First, the specification states that a cross brace member is an example of a retaining assembly: "the retaining assembly (e.g., cross brace member)." (*Id.* at 10:7.) The specification even uses the terms "cross brace member" and "retaining assembly" interchangeably. (*See id.* at 10:10 (referring to structure 36 as the retaining assembly); 10:19–20 (referring to structure 36 as the cross brace member).) Additionally, the retaining assemblies in all four figures in the specification appear to be composed of single cross brace members. (*Id.* at Figs. 1–4.)

This broad construction of retaining assembly is, however, at odds with other patent claims. Claims 59 and 60 state that a "cross brace member connects the retaining assembly" to the frame and the table top respectively. (*Id.,* Claims 59–60.) These claims indicate that the retaining assembly is distinct from a cross brace member. Construing the term "retaining assembly" to include structures that consist solely of a cross brace member would render these claims meaningless because the cross brace member would be the retaining assembly, rather than a structure that connects the retaining assembly to the frame and table top.

This broad construction is also inconsistent with the ordinary meaning of the term "assembly." The ordinary meaning of the term "assembly" is "the fitting together of manufactured parts into a complete machine, structure, or unit of a machine" and "a collection of parts so assembled." Claim terms are presumed to possess their

ordinary meaning, and the party advancing a different meaning must overcome this strong presumption. *Apex,* 325 F.3d at 1370. Lifetime's proposed construction—that an assembly can consist of one part—would render certain claims meaningless, so we find that the broad usage of the term "retaining assembly" in the specification does not overcome the presumption that terms should be accorded their ordinary meaning.[5] Therefore, we construe the term "retaining assembly" as a structure that consists of more than one part. Accordingly, a cross brace member cannot constitute a retaining assembly.

We now turn to whether a retaining assembly only applies to structures that "interrelat[e] the ends of the two support braces to one another thereby to nullify a force applied to one of them." We decline to adopt this narrow construction. First, the ordinary meaning of the term "retain" is much broader; it means "to hold secure or intact." Second, the patent's claims do not define this term in such a technical manner. Third, the only evidence GSC has provided in support of this claim limitation is the patent's specification. The specification states that:

the retaining assembly generally provides structural support to the center of the table top of the utility table. It will further be appreciated that with the distal ends attached contiguous each other in retention to the cross brace member, forces applied to the table top which would ordinarily be transferred through one of the support pivotal braces, respectively, into the table top causing it to bow, will substantially be nullified by the counter force provided by the opposing pivotal support brace, respectively.

(R. 58, Keller Decl., Ex. A, '092 Patent at 10:14–24.) We cannot read a limitation

---

**5.** We also note that Lifetime has previously relied on the ordinary definition of "assem-

bly" when defending its patents. (*See* R. 74, GSC's Brief, Ex. 26, Lifetime's Reply at 7.)

into a claim from the specification. *Lie-bel–Flarsheim,* 358 F.3d at 910. Fourth, although GSC makes an argument on the basis of the patent's prosecution history, it did not provide the Court with the relevant portion of the prosecution history. We cannot conclude without reviewing the prosecution history whether Lifetime affirmatively stated that the term "retaining" should be so limited. *See Vitronics,* 90 F.3d at 1582 (stating that the prosecution history should only be considered if it is in evidence). For all of these reasons, we decline to construe the term "retaining assembly" in this manner, but if GSC submits the relevant prosecution history, we will reconsider this one aspect of our opinion.

### D. Mounting Member

 '092 patent claim 81 states that the table comprises two mounting members "connected to the table top" that receive the cross brace members of the retaining assemblies. (R. 58, Keller Decl., Ex. A, '092 Patent, Claim 81.) GSC claims that four of its tables (the Enduro four foot table, the Enduro Rochester table, and the 2003 Enduro six foot and eight foot tables) lack mounting members. The underside of these tables include a channel through which each cross bar passes, which GSC claims is not a mounting member.

By stating that the mounting member is connected to the table top, the claims indicate that the mounting member is a separate and distinct entity from the table top. Lifetime, once again, asserts that the specification indicates that the term "mounting member" should be broadly construed because it states that the mounting member "may be integral with the table top and may be formed by means of a correspond-

ing mold and blow-molding process." (*Id.* at 11:47–53.) We decline to adopt this broad construction because it is at odds with the claim language that states that the mounting member is connected to the table top. The ordinary meaning of the term "connect" is "to become joined," which envisions that two connected items were at one time unconnected. Therefore, we construe the term "mounting member" as a structure that is separate and distinct from the table top; a mounting member cannot be an integral part of the table top.[6]

### E. Securing Member

 '092 patent claim 82 states that the table comprises "one or more securing members connected to the table top." (*Id.,* Claim 82.) GSC claims that four of its tables (the Enduro four foot table, the Enduro Rochester table, the 2003 Enduro six foot table, and the Enduro eight foot table) do not have a securing member connected to the table top. GSC asserts that these structures are integral to its tables' tops. We apply the same reasoning we used to construe the term "mounting member" and construe the term "securing member" as a structure that is separate and distinct from the table top; a securing member cannot be an integral part of the table top.

### F. Foot Portion

 '092 patent claim 102 states that the table comprises "an elongated portion and a foot portion of the first and second support pedestals" and that "the foot portion ... [is] less than the width of the table top." (*Id.,* Claim 102.) GSC claims that four of its tables (the Enduro four foot table, the Enduro Rochester table, the 2003 Enduro six foot table, and the Endu-

---

**6.** We also note that the differences between the mounting member in this patent and the mounting member in patent '331, discussed in more detail below, which is "integrally formed in the mounting surface of the, [sic] table top." (R. 58, Keller Decl., Ex. B, '331 Patent, Claim 1.)

ro eight foot table) do not have feet portions. The patent is silent about the proper meaning of this term, and neither party proposed a possible construction. We, therefore, construe this term consistent with its ordinary meaning. Portion means "an often limited part set off or abstracted from a whole." Foot, in this context, means "the lower end of the leg of a chair or table." We construe the term "foot portion" to mean "the lower part of a support pedestal."

### G. First End and Second End

■ '092 patent claim 58 states that the table comprises: "a table top including a first end, a second end, a working surface, and a mounting surface." (*Id.*, Claim 58.) GSC claims that the Enduro II five foot round table lacks a first or second end because it is round. We agree that a round table top has no ends, but a round table has various structures that permit the identification of the first and second ends: namely the side rails and support pedestals. The specification states that "the table top ... may be configured in a variety of shapes and configurations, including, but not limited to, a circle, polygon, square, rectangle, triangle, or any other suitable geometrical configuration." (*Id.* at 7:13–17.) We, therefore, construe the terms "first end" and "second end" to be "the terminal points along a longitudinal axis upon which the frame is oriented." [7]

### II. Disputed Terms in the '331 Patent

■ We construe the terms "frame" and "retaining assembly" in the same manner as we construed them in the '092 patent. The only other disputed term in this patent is "mounting member." '331 patent claim 1 states that the table comprises:

a mounting member integrally formed in the mounting surface of the, table top as part of a unitary, one-piece structure, the mounting member including a generally hollow interior portion that is formed as a unitary portion of the generally hollow interior portion of the table top, the mounting member being sized and configured to receive and retain at least a portion of the retaining assembly in a generally fixed position relative to the table top.

(R. 58, Keller Decl., Ex. B, '331 Patent, Claim 1.) GSC asserts that six of its tables (the exception is the Enduro II five foot round table) do not have mounting members; it claims that its tables only have a channel on the underside of the table top. According to the claim, a mounting member is more than a channel on the underside of the table because it includes "a generally hollow interior portion." (*Id.*) The patent's specification states that "each mounting member includes a groove configured as a corresponding size and shape sufficient to retain the cross brace member therein." (*Id.* at 11:13–17.) The specification also states that "the cross brace member may be snap fit into the groove of the mounting member." (*Id.* at 11:17–19.) The specification indicates that a groove or channel is an aspect of a mounting member, but does not address a mounting member's "generally hollow interior portion." The specification's figures show mounting members that protrude from the table top that would contain a "generally hollow interior portion." (*Id.*, Figs. 2–3.) We, therefore construe the term "mounting member" to require "a generally hollow interior portion." Accordingly, a channel in the table top, that did not have this feature, would not be a mounting member.

---

7. We note that this construction is consistent with the construction in *Lifetime Products Inc. v. Blumenthal Distributing, Inc.*, No. SA CV 03–0033–GLT (Anx) (C.D.Cal. Nov. 4, 2003). (R. 95, Notice of Decisions in Companion Cases, Ex. F, *Blumenthal* Opinion at 4.)

## III. Disputed Terms in the '404 Patent

We construe the term "frame" and "retaining assembly" in the same manner as we construed them in the '092 patent. The remaining disputed term is "lip." GSC claims that three of its tables (the three Enduro II tables) do not have lips. '404 patent claim 1 states that the table comprises:

> a lip integrally formed as part of the unitary, one-piece table top, the lip being generally free-standing and independent from other reinforcement structures that are integrally formed as part of the table top.

(R. 58, Keller Decl., Ex. C, '404 Patent, Claim 1.) The dispute relating to this term, however, appears to relate solely to the meaning of the terms "free-standing" and "independent," which are construed in note 2, *supra*. (*See* R. 73, GSC's Non–Infringement Charts, Ex. 15, Enduro II Four Foot and Six Foot Tables Non–Infringement Chart at 2–4, 7–9; Ex. 23, Enduro II Five Foot Round Table Non–Infringement Chart at 3–4, 8–9.) Because we have already construed the terms at the heart of the dispute, we decline to also construe the term "lip."

## IV. Disputed Terms in the '552 Patent

We must construe the following disputed terms in the '552 patent: (1) plank, (2) web, (3) undersurface, and (4) restraining means.

### A. Plank

■ The '552 patent discloses a "Plank for a Bench or the Like." (R. 59, Duke Decl., Ex. A. '552 Patent.) GSC claims that six of its tables (the exception is the Enduro II five foot round table) do not infringe this patent because a table top is different from a plank. GSC's argument is supported by the ordinary meaning of the term "plank:" "a heavy thick board." The ordinary meaning of the term "board" is "a piece of sawed lumber of little thickness and a length greatly exceeding its width." Lifetime asserts that a plank can be a table top because the specification states that "[t]he plank can be used for both the bench seats and the table top." (*Id.* at 5:26:27.) The associated figure, however, shows a table top that consists of three planks. (*Id.,* Fig. 1.) The specification, therefore, indicates that a table top can consist of planks, not that a plank can be a table top. Table tops, however, can come in a variety of shapes and sizes. Side tables and buffet tables are almost always in the shape of a plank. Therefore, we find that the term "plank" includes table tops whose length greatly exceeds their width.

### B. Web

■ '552 patent claim 1 states that a plank comprises "an elongated unitary structural element formed of a synthetic resin material and including a substantially flat load web defining a load surface and an undersurface." (*Id.,* Claim 1.) GSC claims that six of its tables (the exception is the Enduro II five foot round table) have table tops that are not webs because the table tops have separate upper and lower walls. The only relevant meaning of the term "web" is a "thin metal sheet, plate, or strip." The specification also indicates that the web of the plank is a thin sheet of plastic; one side of the sheet is the top of the plank or load surface and the other side of the sheet is the bottom of the plank or undersurface. (*See id.,* Fig. 4.) Accordingly, we construe the term "web" to mean a "thin sheet, plate, or strip."

### C. Undersurface

■ '552 patent claim 1 states that a plank comprises "a pair of side walls extending normally from said undersurface, and a plurality of internal walls ex-

tending normally from said undersurface." (R. 59, Duke Decl., Ex. A. '552 Patent, Claim 1.) GSC claims that six of its tables (the exception is the Enduro II five foot round table) have side walls and an internal wall that extend from the load surface rather than from the undersurface. Lifetime acknowledges that the side walls and internal walls on GSC's table tops "extend down from the load surface in a direction normal to the undersurface." (*See* R. 60, Lifetime's Second Supplement to Claims Infringement Charts, Exs. 16–20.) The parties do not appear to dispute the meaning of the term "undersurface;" they dispute whether walls extending normally from the load surface in the direction of the undersurface infringe upon this patent. To ensure no dispute about the meaning of the term undersurface, we construe it consistent with its ordinary meaning as "underside."

### D. Restraining Means

The parties agree that the term "restraining means" is a means-plus-function element governed by 35 U.S.C. § 112, ¶ 6. When construing a "means-plus-function" element, the Court must first review the patent's claims to identify the particular function. *Med. Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed.Cir.2003). The Court must "stay[ ] true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed.Cir.2003). The court must then review the specification to identify the structure that corresponds to the claimed function, but a disclosed structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed.Cir.1997)).

'552 patent claim 1 states that the "elongated structural element ... in-clud[es] a restraining means for restraining said reinforcing bars from twisting about the longitudinal axis during loading of said plank in a direction normal to said load surface." (R. 59, Duke Decl., Ex. A. '552 Patent, Claim 1.) Claim 1 clearly states the restraining means' function. The specification also states that the "structure of the element" is the corresponding structure that performs this restraining function. (*Id.* at 4:52–53.) In other words, the "elongated structural element" is shaped so that, when the reinforcing bars twist, they will be restrained by various parts of the "elongated structural element," specifically the tabs, fastening sites, bushings, the adjacent internal wall, the undersurface, and the gussets. (*See id.*, at 4:56–5:11.) Therefore, we construe the term "restraining means" to mean "the tabs, fastening sites, bushings, adjacent internal wall, undersurface, and gussets of the elongated unitary structural element that restrain the reinforcing bars from twisting about the longitudinal axis during loading of the plank in a direction normal to the load surface."

The parties dispute whether GSC's tables have tabs, gussets, or bushings. We will not construe these terms because they are not used in the patent's claims, but we note that these terms were not defined in the specification, nor were they used in a manner inconsistent with their ordinary meanings.

### CONCLUSION

The disputed terms are construed as stated above. This case is hereby set for a status hearing on June 15, 2004 at 9:30 a.m. The parties are again requested to re-evaluate their respective final settlement positions in light of this Court's ruling.